**186 So. 88**

**EMERSON v. SHIRLEY et al.**

**No. 34884.**

Nov. 28, 1938.

Rehearing Denied Jan. 10, 1939.

S. W. Plauche, of Lake Charles, for appellant.

Pujo, Hardin & Porter, of Lake Charles, for appellees.

PONDER, Justice.

This is a suit by Sloan A. Emerson against J. B. Shirley and Charles O. Noble for the rescission and annulment of a deed from Emerson to Shirley conveying 1/160

royalty interest in a tract of land in Acadia Parish known as the Leckelt tract.

The plaintiff alleges in his petition that he and the defendant Noble entered into a verbal agreement in the year 1919 to purchase oil, gas and mineral leases, oil, gas and mineral royalty interests, etc., for their joint account with the view of making a profit which was to be equally divided between the plaintiff and Noble; that this relationship existing between the plaintiff and the defendant Noble has never been dissolved although the firm has not engaged in any active operations since 1929; that on November 22, 1926, during the active operations of the firm, the plaintiff and the defendant Noble purchased a 1/80 part of all the gas or other minerals produced from a certain tract of land containing 144 acres known as the Leckelt tract; that on the 23rd day of December, 1926 the plaintiff and the defendant Noble acquired an additional 1/80 oil, gas and mineral interest covering the same property; that at the time of the purchase there existed a fiduciary and confidential relationship which has continued to exist until an attempt was made to fraudulently divest the plaintiff of his royalty interest; that sometime prior to September 21, 1936, the defendant Shirley and the defendant Noble received information that a producing oil well was about to be brought in on the tract of land and that a producing oil well was brought in on the property on or about September 26, 1936, which had the effect of making the plaintiff's royalty interest worth not less than $40,000; that on September 21, 1936, that the defendants connived and conspired together for the purpose of acquiring the plaintiff's royalty interest for a nominal sum, thereby defrauding plaintiff of his royalty interest, without giving plaintiff the benefit of the information they possessed; that the defendants conspired together to obtain an unjust advantage over the plaintiff by acquiring his valuable royalty interest by artifice and design, having in their possession information that a producing well was about to be brought in and that plaintiff was in total ignorance of any drilling operations being conducted on the land; that in pursuance of the conspiracy to defraud the plaintiff the defendant Shirley called at the plaintiff's home on the afternoon of September 21, 1936, and entered into an agreement with the plaintiff to purchase his remaining royalty interest for the sum of $1000 and on the following morning the defendant Shirley induced the plaintiff to sign a deed conveying the 1/160 mineral royalty interest for a consideration of $500; that the defendant Shirley took the title to the royalty interest merely as an interposed party for the use and benefit of the defendant Noble; that on the 21st and 22nd day of September, 1936, when the royalty interest was negotiated for and transferred that the plaintiff was excessively drunk to the extent that he was incapable of exercising judgment or of knowing what the agreement was about, in fact the plaintiff was so drunk that he did not know what took place at the time; that plaintiff's condition of absolute drunkenness was known to both of the defendants, but the defendant Shirley, with full knowledge of the plaintiff's condition and the plaintiff's ignorance of the impending oil well, without intimating

the facts concerning the impending oil well to the plaintiff's wife, took advantage of the plaintiff's condition, suppressed facts which the plaintiff was entitled to know and fraudulently caused the plaintiff to sign the deed for a vile consideration knowing at the time that the royalty interest was worth at least $40,000; and that the plaintiff deposits the $500 in the registry of the court. The plaintiff prayed for the rescinding, setting aside and annulling of the royalty deed from plaintiff to the defendant Shirley. In the alternative the plaintiff asks for judgment against the defendant Shirley, individually, rescinding, setting aside and annulling the royalty deed from the plaintiff to the defendant Shirley. The defendant Shirley filed an exception of no right or cause of action on the ground that he had transferred the property to Noble before the suit was filed. The plaintiff filed a supplemental petition alleging in effect that the transfer from Shirley to Noble was made in furtherance of the conspiracy and was part of the fraudulent transaction by which Noble acquired the royalty interest, to Noble's knowledge worth $40,000, for the price of $500. Subsequently the exception of no cause of action was amended wherein the defendant Noble interposed the exception of no cause of action. The lower court sustained the exception of no cause or right of action interposed by the defendant Shirley. On appeal the judgment of the lower court was reversed, the exception of no cause or right of action as to both of the defendants overruled and the case was remanded to the lower court for further proceedings, Emerson v. Shirley, 188 La. 196, 175 So. 909. The defend-

ants filed separate answers to the suit which were in effect a general denial. Upon trial of the case the lower court rendered judgment in favor of the defendants rejecting the plaintiff's demand. The plaintiff appeals. After the appeal was lodged in this Court, Charles O. Noble, one of the defendants, died on May 9, 1937, and his heirs, Charles O. Noble and Mrs. Eula Noble Reeves, were substituted as parties defendant in the place and stead of Charles O. Noble, deceased.

The appellant contends that the lower court erred: (1) In holding that the defendants did not acquire the royalty deed through fraud and (2) that the court erred in not holding that the plaintiff was so intoxicated that he was incapable of exercising his reason or of understanding the transaction or of knowing what he was doing.

The defendants, appellees, contend (1) that there was no fraud committed, (2) that the plaintiff was not incapacitated by reason of drunkenness or otherwise at the time the royalty deed was executed, (3) that the contract of a drunken man is merely voidable not void and (4) conceding for the sake of argument that Emerson was incapacitated from contracting on both September 21 and September 22, he has ratified the sale of royalty made by him. In the defendants' supplemental brief it is contended that the claim is based on a stale demand.

There seems to be no dispute as to the law applicable to this case. Furthermore, this Court went into an exhaustive discussion of the law applicable to this case when

it passed on the exceptions of no cause or right of action. Emerson v. Shirley; 188 La. 196, 175 So. 909. The case resolves itself strictly to a question of fact. The questions presented for our determination are, viz.: (1) Whether or not the evidence shows the defendants acquired the deed through fraud, (2) whether or not the plaintiff was incapacitated by reason of drunkenness at the time the transaction was negotiated and the deed executed and (3) whether or not the plaintiff ratified the sale.

We first take up the question as to whether or not fraud was practiced on the plaintiff. From an examination of the evidence it appears that Noble and Emerson jointly acquired quite a number of mineral leases, deeds to undivided interests in lands, deeds to mineral rights and deeds to royalty interest. The evidence shows that at various times during this period of time they engaged jointly in the operation and production of oil. There is considerable documentary evidence, such as copies of deeds, etc., to this effect in the record. There is evidence to the effect that during this period of time when one of the parties acquired such interests by deed the party acquiring it would transfer half of the interest acquired to the other party by deed. On May 16, 1931, Noble and Emerson acquired from the Edgerly Petroleum Company, Inc., a mineral lease, two producing wells and other property. In that deed it is stated that it was acquired by Noble and Emerson, a partnership composed of Charles O. Noble and Sloan A. Emerson. We find in the record a letter of date June 2, 1931, addressed to S. A. Emerson, which reads:

"C. O. Noble
"Lake Charles, La.         June 2, 1931.
"Mr. S. A. Emerson,
"Vinton, La.;
"Dear Sir:

"This is to advise that I have this day executed instrument prepared by Messrs. McCoy, Moss and King, conveying to you my one-half (½) interest in the property which you recently acquired from the Vincent Heirs, at Ged, La., for the partnership of Noble and Emerson. This instrument has been placed of record, and you will be furnished with Duplicate original in early mail.

"Yours very truly,
"C. O. Noble
"By (Sgd.) H. N. Fanguy
"CON/F                        Sec'y."

The defendant Noble in his testimony states that his secretary wrote the word "partnership" in the letter without his instruction. The secretary, whose connections with Noble had been previously severed, testified that Noble dictated the word "partnership" to him. Noble testified that he discharged the secretary sometime previously on account of the secretary trying to assume too much authority. While there is conflict between the testimony of the defendant Noble and the testimony of Emerson, yet they both testify to the effect that quite a number of mineral rights, royalty interests, leases, etc., were jointly acquired by them and that they had engaged in several instances jointly in the operation and production of oil. The de-

fendant Noble denies that they were engaged in a joint enterprise but admits that they in a number of instances owned joint interests and in particular instances jointly operated and produced oil but denies that there was ever any joint adventure on their part. The defendant Noble testified when they purchased such interest together each would pay his part of the purchase price and each would receive the profit from the sale of his respective part of the interest. The plaintiff testifies that he and Noble did practically everything as partners. The plaintiff states in his testimony to the effect that there was an understanding or agreement of partnership but there was no written agreement to that effect. All the documentary evidence such as the various deeds and the aforementioned letter corroborates the plaintiff's testimony to the effect that they were engaged in a joint enterprise. We find in the documentary evidence in one instance where Noble acquired certain mineral leases in his name that he subsequently executed an act declaratory of interest in which he declared that when he acquired the lease he was acting jointly for himself and Emerson and that Emerson was owner of one-half interest therein. All of these transactions were consummated long prior to the passage of the disputed deed and at a time unsuspicious. These transactions show that they were not engaged in a single joint transaction but in numerous joint transactions which goes to show that they were engaged in a joint enterprise. Furthermore, since a relationship of this nature having existed for such a long period between Noble and Emerson it is indeed strange that Noble would get practically a complete stranger to Emerson to go to Emerson to acquire the deed. It is admitted that Shirley acquired the deed for Noble, acting as Noble's agent, on a commission basis. Another strange thing is that Shirley acquired the deed in his own name instead of his principal's, Noble's name, and later deeded the interest to Noble.

The evidence shows that at the time the deed was passed the defendant Noble had information to the effect that the prospects were favorable for the production of oil. Noble testified he had this information through rumors. Noble's son, who was associated with Noble, was a member of an oil scouts organization in Lake Charles. The organization would meet weekly and discuss the oil operations in south Louisiana. Noble's son testified that he had received no official information through his organization relative to the progress of the well on the land covered by this royalty deed but that the oil scouts would congregate in drug stores, etc., and talk about the various wells, and that he had heard the well was looking good. The evidence shows that Emerson did not even know the well was being bored, much less the progress of the well. It appears that shortly before this transaction was consummated on September 18, 1936, that oil sands had been penetrated. The evidence shows that the information which Noble had as to the favorable prospects of the production was not transmitted to the plaintiff Emerson and that at the time Emerson signed the deed he was ignorant of this fact. At the time that Emerson and Noble acquired the

royalty interest in this property in 1926, Emerson paid at the rate of $1,375 for the ¹⁄₁₆₀ part in dispute herein. There is expert testimony in the record as to the value of this royalty interest as of the date of the deed in dispute herein. The values fixed ranged from $7,500 to $35,000. One witness testified that the value was entirely speculative. The preponderance of the testimony shows that the interest in dispute herein is worth not less than $15,000. The evidence shows that shortly after the execution of the controverted deed the well became a producer.

The evidence shows that Emerson began drinking on September 8th and on September 11th he became so thoroughly intoxicated that he was incapable of transacting business of any nature whatsoever, which condition he remained in until September 25th or a day or two later. There is evidence to the effect that he was brought a quantity of beer and whiskey daily during this time. The evidence shows that he drank beer and whiskey steadily day and night during this time. Since this transaction was negotiated on the afternoon of September 21st and completed on the morning of September 22nd, it will only be necessary to refer to the evidence to ascertain Emerson's condition at that time. There is considerable testimony as to his condition during his protracted drunkenness from September 11th to 25th or later which we will not go into but in passing we might say that this evidence shows that he was in no condition during the entire time to transact any business. It was testified by Mrs. Emerson and Helen Poynter, the maid, that, on the afternoon of September

21st at the time that Shirley negotiated with Emerson for the deed, Emerson was so drunk that he did not know what he was doing. Clarence J. Clemmons, Mrs. Chargois, Mrs. Batchelor and Raleigh Breaux testified that they saw Emerson shortly after Shirley left, we would say the evidence shows within thirty minutes, and that Emerson was in such a drunken condition that he was utterly incapable of transacting any business or knowing what he was doing. The evidence shows that some thirty minutes after Shirley left that Emerson's condition became such that a physician, Dr. Foreman, was called in. Dr. Foreman testified to the effect that when he arrived he found Emerson exceedingly drunk, devoid of reasoning powers and incapable of exercising any judgment. The physician testified that he gave him a hypodermic to quiet him. The only evidence to the contrary was that of Shirley. However, Shirley testified that Emerson drank beer three times while he was there. Mrs. Emerson testified that when Shirley first came she informed Shirley that he could not see Emerson because he was drunk. Shirley testifies that Mrs. Emerson told him that her husband was drinking. Mrs. Emerson testified that her husband overhearing the conversation hollered, "Let the S. B. in." Shirley testifies that Emerson hollered, "Come in." Mrs. Emerson testified that when Shirley was leaving that Shirley asked her, on the front porch, what she thought of the deal, that she told him that he knew Mr. Emerson was drunk and didn't know what he was doing but there was nothing she could do about it. She testified that Shirley stated, "We wait-

ed three or four days on a drunk man to get sober and the property went up $925 an acre." Shirley admits having a conversation with Mrs. Emerson when he was leaving but denies that the statements were made. The testimony shows that on this occasion Emerson was dressed in pajamas and lounging robe. It was this time that the agreement was entered into but not signed. The evidence shows that Shirley went to Emerson's house on the morning of September 22nd between nine and ten o'clock to complete the transaction. Shirley testified that he found Emerson in bed but that he was not drunk. It was on this occasion that the deed was signed. Several witnesses testified that on that morning Emerson was in such an intoxicated condition that he was utterly incapable of transacting any business. Some of the witnesses testified that he was in such a condition that he did not recognize them. All the witnesses testified that he was confined in bed. The witnesses who testified to this effect were, viz.: Mrs. Emerson, Helen Poynter, C. J. Clemmons, J. S. Turpin and Mrs. Batchelor. The only witness who contradicts all the testimony as to the condition of Emerson on September 21st and 22nd is Shirley. There is the testimony in the record of Dr. Brooks who testified that he called and treated him on three occasions between September 8th and 23rd and that on September 23rd Emerson was so drunk that he was actually devoid of reason. Dr. Frank Fenwick Young who founded the Fenwick Sanitarium forty-seven years ago and has been in charge of its continuous operation to this date testified that he has treated between eight and nine hundred cases of liquor addiction. In his testimony he quotes numerous authorities as to how liquor affects the brain and mental faculties. Without going into a detail narration of Dr. Young's testimony we would say that his testimony shows that Emerson was a patient in the Fenwick Sanitarium on several occasions and that the last time he entered there as a patient was on August 10, 1929. Dr. Young stated, assuming Emerson drank heavily and steadily from September 12th to September 26th, that he did not see how Emerson could be other than drunk and if drunk he was mentally incompetent, and drinking so heavily his judgment, reasoning power, thinking and all higher mental functions would of necessity be totally or nearly arrested. He testified that a person in such condition could sign an act but that he would be doing this purely as a automatom.

■ The defendants contend that the plaintiff has ratified the sale because he failed to void the agreement within a reasonable length of time after he became sober. The evidence is conflicting as to the exact date Emerson became sober, but it shows that he became sober between September 25th and 28th. The evidence shows that Emerson consulted his lawyer between the 28th of September and the 1st of October with the view of entering suit to void the deed. The evidence shows that his lawyer informed him that he could not bring suit at that time on account of being engaged in two important cases, Gulf Refining Co. of La. v. Glassell et al., 186 La. 190, 171 So. 846, and Miami Corporation v. State, 186 La. 784, 785, 173 So. 315, but that he would bring the suit just

as quick as he could, which his counsel did. The suit was entered on December 21, 1936, practically two months from the date the deed was passed. There is evidence to the effect that the draft given in payment of the deed was deposited by Mrs. Emerson to the account of S. A. Emerson, that S. A. Emerson transferred it to the account of Emerson Oil Corporation and that some checks were subsequently issued against the account. This in itself would not be sufficient to show that Emerson intended to ratify the transaction. International Accountants Society v. Santana, 166 La. 671, 117 So. 768, 59 A.L.R. 276. In fact if he had prior to the institution of the suit let out information that he intended to sue to have the deed declared void, it would have been possible for the property to be transferred into the hands of a third party. The testimony shows that his counsel advised him not to let out any information as to what he intended to do for that very reason.

For the reasons assigned, the judgment of the lower court is reversed and set aside and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiff rescinding, setting aside and annulling the royalty deed from S. A. Emerson to J. B. Shirley of date September 22, 1936, original No. 129,461, filed for record September 23rd at 9:00 A. M., recorded September 23, 1936, in Conveyance Book O-5, pages 628, 629, of the conveyance records of Acadia Parish, Louisiana. It is further ordered, adjudged and decreed that the $500 deposited in the registry of the court in this suit be decreed the property of the defendants, Charles O. Noble and Eula Noble Reeves. The defendants to pay all costs.

On Application of the Appellee for
a Correction of the Decree

PER CURIAM.

During the time allowed for the filing of a petition for a rehearing the plaintiff, appellee, filed a petition for a correction of our decree, or for a rehearing, if deemed necessary for that purpose. According to the opinion which we rendered our intention was to set aside both the sale from Sloan A. Emerson to J. B. Shirley, dated September 22, 1936, and the sale from J. B. Shirley to Charles O. Noble, dated September 24, 1936. In our decree, however, by inadvertence, we failed to mention the deed from J. B. Shirley to Charles O. Noble. The decree setting aside the sale from Sloan A. Emerson to J. B. Shirley, of course, had the effect of setting aside the sale from J. B. Shirley to Charles O. Noble. Hence we doubt that it is necessary to add anything to the decree in that respect. In order, however, that the form of the decree may conform with the opinion, it is now ordered that the decree be and it is amended so as to declare that the deed from J. B. Shirley to Charles O. Noble, dated September 24, 1936, as well as the decree from Sloan A. Emerson to J. B. Shirley, dated September 22, 1936, is hereby annulled and set aside. It is not necessary to grant a rehearing for that purpose.