### Hattie A. JOHNSON et al.
### v.
### MANSFIELD HARDWOOD LUMBER COMPANY.
### Civ. A. No. 5562.

United States District Court
W. D. Louisiana,
Shreveport Division.

Jan. 24, 1958.

John M. Madison, Vernon W. Woods, Wilkinson, Lewis, Wilkinson & Madison, Shreveport, La., Ned A. Stewart, Texarkana, Ark., J. W. Patton, Jr., Lewisville, Ark., for plaintiffs.

Sidney M. Cook, Charles D. Egan, Frank M. Cook, Cook, Clark, Egan, Yancey & King, Shreveport, La., for defendant.

BEN C. DAWKINS, Jr., Chief Judge.

We find it our hard duty here to pass judgment upon a family schism of the first magnitude, resulting from the purchase of minority stock by a corporation through alleged fraud on the part of its officers and majority stockholders.

The crux of the case is that, had it not been for this suit, the majority—six people who proceeded to sell and liquidate the corporate assets immediately after the minority stock was bought, notwithstanding promises that this would not be done—would have reaped a profit for themselves, before taxes, of more than $3,400,000, at the expense of the minority, and in addition to nearly $6,000,000 rightly to be received by them in the liquidation for their own stock.

All persons involved are educated, cultured, refined. They have enjoyed, and still occupy, positions of prestige in their home communities. Until this tragic controversy arose, they appeared to be fairly congenial, at least on the surface.

Now, regrettably, they are publicly and irreconcilably divided into two warring camps. One group—the former minority stockholders—is convinced that its members are victims of deliberate fraud perpetrated upon them by the majority. For their part, the majority resists and resents, with equal fervor, the charges made against them.

While the suit is one which ought not to have been necessary, and clearly should have been settled, the depth of feeling is such that compromise has not even been discussed. Consequently, this litigation must run its bitter course, for better or for worse.

The issues, as formed by the complaint and answer, are fully detailed in our earlier opinion, D.C., 143 F.Supp. 826, where, after disposing of various defensive motions, we granted a preliminary injunction. Briefly restated, the gist of the controversy is this:

Plaintiffs are Mrs. Hattie Johnson, Mrs. Jeanette Johnson Jennette, Mrs. Mamie Harrel, J. Allen Harrel, Mrs. Elizabeth Harrel Walker, Mrs. Ruth Harrel Mulkey, Mrs. Minette Velvin, Mrs. Alice S. H. Brown and Max Brown, residents of Louisiana and Arkansas.

At the times in question, Mrs. Johnson, Mrs. Harrel, Mrs. Velvin and Mrs. Brown were aged widows, largely dependent upon defendant's dividends for their livelihoods. J. Allen Harrel was blind.

On May 1, 1953, plaintiffs owned 1,567 shares of defendant's stock. Defendant's officers, and those whom they allegedly represented or controlled, owned 2,751 shares, being approximately 56 per cent of the 4,836 shares then outstanding. Plaintiffs contend that, in 1952, or early 1953, defendant's officers conceived a fraudulent scheme, acquiesced in or ratified by the others whom they represented, whereby plaintiffs were to be induced to sell their stock to the company for grossly inadequate prices. They allege that, in furtherance of this scheme, they were told by these officers that defendant was about to engage in a long-range reforestation program upon its timberlands; that because of this, and their intention to avoid double taxation by permitting larger salaries and bonuses to be drawn by the officers, there would be little or no dividends paid to the stockholders for the next fifteen or twenty years; and that there were no plans or prospects for liquidation of the company. Plaintiffs further allege they first were offered $300 per share for their stock. After some negotiations, and because they believed and relied upon defendant's representations, as made by its officers, all but two of the plaintiffs sold their stock to the company for $350 per share, and the other two sold theirs for $400 per share.

Plaintiffs contend that, almost immediately after the last stock had been purchased, in November, 1953, defendant began negotiations to sell the corporate assets, culminating in sales effected in the late spring of 1956, and a liquidation whereby the majority group, if undeterred, will realize more than $3,-300 per share for their stock. Plaintiffs further contend that, if they had not been fraudulently induced, by the false representations made to them by defendant's officers, to sell their stock to the company, they would have received almost $2,100 per share for it, as against the $350 or $400 per share they actually were paid, being less than one-fifth of the actual liquidated value of the corporate assets. Accordingly, they prayed for an injunction to restrain defendant from distributing to its remaining stockholders the proceeds of the liquidation still remaining in its hands; further asking for a decree rescinding the sales of their stock, recognizing them as its equitable owners, and, thereafter, that an accounting be ordered.

As noted, the preliminary injunction was granted, and our action in that respect was affirmed by the appellate Court, 5 Cir., 242 F.2d 45. The injunction was mandatory in form, requiring that defendant transfer to a bank, as Court-designated trustee, its remaining assets, totaling approximately $1,300,000 in cash, plus certain other properties. This was done and the funds have been invested by the trustee in short-term Government securities earning more than 3% per annum interest. The trustee now holds these funds and properties, secured by a pledge of Government bonds, subject to further orders of the Court upon final decision of the case.

In its answer, defendant has denied generally and specifically that it or its officers were guilty of the fraudulent conduct attributed to them by plaintiffs. It also has asserted various special defenses which will be particularized as we proceed.

After a full trial on the merits, lasting more than a week; having heard all of the parties and their witnesses; having considered the lengthy briefs (totaling approximately 300 pages), and the authorities cited; having studied the transcript of testimony and exhibits (some 1255 pages); having heard the oral arguments of respective counsel, lasting nearly three hours; and having reached our findings of fact and conclusions of law, we now set them down for the record. They represent to us the only result which justly could come from the evidence before us.

While there are some facts not in dispute, there are many more which are hotly controverted, especially as to what was said or not said, done or not done, known or not known, with regard to the purchase of plaintiffs' stock. In stating the facts we have found, our statements are based upon what we believe to be the truth, notwithstanding some testimony to the contrary. We also have drawn inferences, which we believe to be reasonable and correct, from the facts and circumstances in evidence.

We begin with the founding of the company, and proceed chronologically down to date, covering the important points as they developed.

The business that became Mansfield Hardwood Lumber Company was organized shortly after the turn of this century. It first was operated in South Arkansas, later moving its headquarters to Mansfield, Louisiana, thence to Shreveport. In 1940, it was chartered as a Delaware corporation, but by then its principal office, and most of its properties, were located in Louisiana.

Its founders were A. S. Johnson and N. D. Harrel. Johnson was married three times, first to Alice Farrow, their only child being H. Ben Johnson. After his first wife's death, A. S. Johnson married Mattie Harrel, sister of N. D. Harrel, but no children were born to this union. When Mrs. Mattie Harrel Johnson died, A. S. Johnson married Mrs. Hattie A. Johnson, and of this marriage was born but one child, Jeanette Johnson, who later married Charles L. Jennette. A. S. (Bud) Johnson and his sister, Mrs. Margaret Johnson Long, wife of T. W. M. (Tom) Long, were the only children of the marriage of H. Ben Johnson and Mrs. Eleanor Ewing Johnson, all three of whom survived him at his death in 1948.

The first A. S. Johnson served as president of the business from its beginning until his death in 1929, when his stock in the defendant company was inherited by his son, H. Ben Johnson, his daughter, Jeanette, and his widow, Hattie, the latter two receiving 668 and 547 shares, respectively. When H. Ben Johnson died, the stock he then owned (1,296 shares) was inherited by his children, Bud and Margaret, and his widow, Eleanor, he previously having given them 1,119 shares, making a total of 2,415 shares.

N. D. Harrel was the husband of Mrs. Mamie Harrel, they being the parents of Tracy Harrel, J. Allen Harrel, Frank Harrel, Mrs. Elizabeth Harrel Walker and Mrs. Ruth Harrel Mulkey. Upon N. D. Harrel's death, his widow and children inherited from him a fairly substantial block of defendant's stock, some of which had been acquired by defendant before 1953. Mrs. Mamie Harrel died in 1956, after this suit was filed, her estate now being represented by Cora Harrel, administratrix. On January 1, 1953, she and her children, except Tracy Harrel, owned a total of 256 shares, her part being 131 shares. Mrs. Minette Velvin owned 51 shares, Mrs. Alice S. H. (D. K.) Brown, 10, and Max Brown, 65. Mrs. Velvin also died after the suit was filed, on April 23, 1957. Her estate is represented here by Drew Velvin, executor.

Upon the death of A. S. Johnson in 1929, he was succeeded as president of the company by his son, H. Ben Johnson. When the latter died in 1948, his son, Bud Johnson, was elected as his successor. The first vice-president, before and after H. Ben Johnson's death, was Brown McCullough, husband of Rosalind Kalmbach. He is the nephew of Mrs. Alice S. H. Brown, and a first cousin of Max Brown. In September, 1951, at the request of Bud Johnson, Max Brown resigned as second vice-president of defendant, and was succeeded by Tom Long, husband of Margaret Johnson. In 1953, Bud Johnson was about 34 years old, McCullough was 63, and Long about 35.

These officers served as such at all times pertinent to the issues involved here. They also acted as members of the Board of Directors, along with four others, three of whom were not active and not conversant with details of the company's affairs.

The actual, active management of defendant was conducted by the officers. Charles L. Jennette, J. R. Heard, Sr., and J. Allen Harrel served as directors, but were not familiar with details of the business and had only vague ideas as to the extent or value of its properties. The only direct contact they had with it was at stockholders' and directors' meetings held once a year, and lasting only two to three hours.

The majority stock ownership, from 1952 until the suit was filed, was as follows:

| Stockholder | Number of Shares |
| --- | --- |
| A. S. (Bud) Johnson | 531 |
| A. S. (Bud) Johnson (subject to usufruct of Mrs. Eleanor Johnson) | 320 |
| Mrs. Eleanor Johnson | 751 |
| Mrs. Margaret Johnson Long | 493 |
| Mrs. Margaret Johnson Long (subject to usufruct of Mrs. Eleanor Johnson) | 320 |
| Tom Long | 7 |
| Brown McCullough | 322 |
| Mrs. Rosalind K. McCullough | 7 |
| Total | 2,751 |

At all times after 1948, Bud Johnson held the proxy of his mother, Mrs. Eleanor Johnson; Tom Long held his wife's proxy, and Brown McCullough held his wife's. The three officers, therefore, had full voting control of the company. Their proxy authority was unlimited and was never revoked. The only time these ladies voted their own stock was at a meeting held on September 26, 1955, when the then stockholders voted to liquidate the company.

During the years after it was moved from Arkansas to Louisiana, defendant gradually acquired a large acreage in timberlands. By May of 1953, and when its assets later were sold, its total timberland holdings approximated 93,000 acres. It also owned lumber mills at Zwolle and Winnfield, Louisiana; retail outlets and lumberyards in five towns and cities in Louisiana, Arkansas and

Texas; 100% of the stock of Reader Railroad, a public carrier line about 25 miles long, operating between Waterloo and Reader, Arkansas, and two subsidiary corporations; as well as its general office building and other properties in Shreveport, the values of which will be shown later.

Although defendant's timberlands were carried on its books, during 1952 and 1953, at their original cost of a little less than $1,000,000, their actual value, well known to defendant's officers by no later than 1952, but not known to any of the plaintiffs except Max Brown, was about nine times that amount. Its total assets, according to its annual statement of June 30, 1952, which was circulated by the officers among its stockholders, were valued at $3,044,593.98. Its stock was closely held, was not traded on the open market, and had no established market value.

Defendant's record of dividend payments, per share of stock, from 1944 through 1955 was as follows:

| | | | |
| --- | --- | --- | --- |
| 1944 | $ 6.00 | 1950 | $13.00 |
| 1945 | 6.00 | 1951 | 12.00 |
| 1946 | 7.00 | 1952 | 5.00 |
| 1947 | 9.00 | 1953 | 4.00 |
| 1948 | 24.00* | 1954 | .00** |
| 1949 | 12.00 | 1955 | 8.00 |

(* The size of this dividend is partly due to the company's having received that year $160,594.68, net, in insurance carried on the life of H. Ben Johnson.)

(** Apparently the company treasury had been exhausted by minority stock purchases made during 1953, described *infra,* some of which were partly paid for in 1954.)

By 1952, it became apparent to defendant's officers that its prospects for lucrative future earnings, commensurate with the intrinsic value of its land holdings, were not bright. This view was supported by the experience of many other companies similarly situated, whose condition was well known in the industry. Contemporaneously with these developments as to businesses such as defendant's, it became clear that large and

growing paper manufacturing companies, whose products were in steadily increasing demand, were interested in buying, or otherwise acquiring, at relatively high prices, large timber holdings to satisfy the prodigious appetites of their mills for pulpwood. This was happening throughout the United States, and particularly in Louisiana, which has four sizeable paper mills located in the northern part of the State.

It was at about this time, we believe, that two events occurred which proved to be of major importance to this case. In fact, from what we have observed of the entire record, we are convinced that, happening as they did against the background of defendant's business prospects, these incidents triggered the course of action thereafter to be followed by defendant in its dealings with its minority stockholders.

Those events were:

1. In 1951–52, the stockholders of Frost Lumber Industries, a corporation domiciled in Shreveport, "captured" some of the greatly increased values of that company's extensive timberlands in this area, with large profits, through a tax-free merger of that company with Olin-Mathieson Chemical Corporation, which also later acquired the stock of Brown Paper Mill Company at Monroe, Louisiana; and,

2. Some time not long prior to August of 1952, defendant's president, Bud Johnson, was offered $5,000,000 by R. O. Martin, President of Roy O. Martin Lumber Company, Alexandria, Louisiana, for defendant's timberlands in the Zwolle, Louisiana, area, which constituted about 55% of defendant's total acreage, and perhaps one-half or less of its total land values. This offer was not accepted. Defendant's minority stockholders and directors were not advised that it had been received.

Those events served a) to apprise defendant's officers, (if they did not already know it, and we are sure they did), that its whole timberlands had a sale value of eight or nine million dollars; and, b) to point to a ready market, willing and able to provide the means by which this great increment of value could be captured by defendant's officers and their immediate families.

It was because of these developments, we think, that defendant's officers formulated the scheme whereby they and theirs, to the exclusion of the minority stockholders, would reap the huge profits they knew were to be had from sale of defendant's assets and distribution of the proceeds to themselves.

At first, we think, it may not have been planned that Mrs. Hattie Johnson and Mrs. Jeanette Jennette would be excluded from sharing in the anticipated profits. This is indicated to some extent by two letters in the record, written to defendant's officers on August 29 and October 14, 1952, by C. L. Brooke, defendant's Certified Public Accountant. Therein he advised them as to possible tax consequences under the 1939 Internal Revenue Code, *vis-a-vis* stock swaps, stock sales, timberland sales, reorganization, etc., which then were under consideration. Plaintiffs never knew of the existence of these letters until a few days before the trial. In 1952 it was contemplated that the remaining minority shareholders' stock would be bought for $574 per share, not $300 as later offered, $350 or $400 as paid, or nearly $2,100, its actual liquidation value.

After receiving these letters (before they were written the accountant had been instructed to assume that the corporation's total assets were worth in excess of $9,000,000), and having ascertained that heavy tax consequences would be incurred by them and their immediate families in a sale or liquidation under the 1939 Revenue Law (both the corporation and the shareholders were subject to capital gains taxes in an outright liquidation), defendant's officers concluded that they would embark on a program whereby the company would buy all of its minority stock, including that of Mrs. Hattie Johnson and Mrs. Jennette, at prices which later would assure heavy profits to those remaining in the company, notwithstand-

ing the tax consequences. A part of this plan was to acquire as much as they could of the other minority stock at about $300 per share, thereafter using whatever that figure might be as a starting point for bargaining with Mrs. Johnson and Mrs. Jennette.

The over-all strategy for accomplishment of the scheme was to apply a "dividend squeeze" upon all the minority stockholders in order to force them to sell their stock for considerably less than its value. This kind of pressure already had been exerted to a substantial extent well before direct stock-buying efforts were begun. As typical, but not necessarily exhaustive, examples of this, we note that the three corporate officers were drawing total salaries from defendant and its subsidiaries of about $67,000 per year, or about $13.85 per share for each of the 4,836 outstanding shares. Of this amount, $10,000 was paid to Brown McCullough and $3,600 to Bud Johnson, in addition to large salaries paid directly by defendant, in their capacity as officers of Reader Railroad. This company had gross earnings of $102,400 in 1952, but it was shown on the company's books as having lost $3,715.35 that year. There was no limit upon the officers' expense accounts, the extent of which is not shown by this record, but in view of all else we have seen, they undoubtedly were handsome.

The officers, plus Mrs. Long, Mrs. Eleanor Johnson and Mrs. McCullough, together with two or three salesmen working for defendant, were partners in a phantom firm known as Shreveport Lumber Sales, located within defendant's own office and operated entirely at its expense, which the officers arranged to serve as a so-called brokerage agency for defendant, charging it a commission of 5% upon its sales. In 1950, 1951 and 1952 defendant's net sales exceeded $2,-700,000 per year. This meant that approximately $135,000 annually, or a little less than $28 per share for each of the 4,836 shares outstanding, was skimmed off from defendant's income by the majority group, and put in its own pockets, before funds available to pay dividends

were realized. In other words, the officers' salaries and these "commissions", totaling about $200,000 per annum, had to be earned by defendant before the minority would get any dividends. The minority stockholders were never told that Shreveport Lumber Sales even existed, much less that it was charging defendant this commission. There was no resolution of record by defendant's stockholders or directors, authorizing the officers to enter into such a burdensome, dishonest arrangement.

Moreover, although defendant's net sales for 1951 amounted to $2,765,775, and for 1952 were larger, being $2,834,-558, dividends paid to stockholders were reduced from $12 per share in 1951 to $5 per share in 1952. Defendant's net sales to the end of its fiscal year on June 30, 1953, amounted to $3,271,056. Yet dividends declared for that year were only $4 per share. There has been no showing of any extraordinary capital expenditures, or any substantial increase in operating expenses, during these years. It is possible, however, and fairly well indicated by the record, that the officers probably bought a large amount of timber from outside sources, instead of cutting from defendant's timberlands, thus maintaining their value for purposes of later liquidation. We can only conclude from these actions that the officers were accomplishing a double purpose by 1) applying dividend pressure, while at the same time 2) "laying in" the difference in order to have treasury surplus funds available from which defendant would pay for the minority stock whose purchase they were planning to effect. Defendant's accumulated surplus, in funds and property, totaled $2,244,075.97 on January 1, 1953. The minority shareholders equitably were entitled to a proportionate interest in this accumulation of value, but the majority obviously did not so regard the matter, using treasury surplus to acquire the minority stock interests.

While there were some unimportant differences in approach to the various minority stockholders, the general theme

of the "dividend squeeze", applied principally by Bud Johnson and Brown McCullough during 1953, was to inform these people that the president and second vice-president were young men, with children of their own and with long futures ahead in the business; that they wanted to avoid double taxation by paying themselves higher salaries and bonuses; that they intended to engage in an intensive reforestation program, together with capital improvements to the lumber mills, extending over a period of many years, during which there would be little or no dividends paid to stockholders; and that these goals could be accomplished with the company's stock in the hands of the few persons constituting the majority. All minority stockholders were definitely assured that there was no plan for liquidation under consideration, and that none was contemplated for the future. The emphasis, instead, was upon "Bud's and Tom's" desire and intention to make lifetime careers, for themselves and their children, in operating the business as a going concern.

Believing in, and relying upon these representations, all plaintiffs, except Mrs. Hattie Johnson and Mrs. Jennette, sold their stock, aggregating 262 shares, for $350 per share.

While all other minority shareholders were approached directly or through relatives, in soliciting purchases of their stock, defendant's officers used a different, clever and most effective method of acquiring the substantial holdings of Mrs. Johnson and Mrs. Jennette. The plan was that these ladies would be coerced into soliciting purchase of their stock by defendant, instead of vice versa.

They and Charles Jennette lived together, with the Jennette children, in Shreveport. He was employed—not by defendant—at a small salary of less than $300 per month, the majority group having refused to give him or his wife a job with defendant, at a handsome salary, as had been done for Tom Long. The officers knew that these people were largely dependent for their living expenses upon dividends from defendant. The Jen-

nettes, with their children and themselves to support, had a total adjusted gross income for 1951 amounting to $6,951.34, of which $5,573.99 was received in dividends from defendant. In 1952 their income was $5,626.72, of which $2,672 was from dividends. Mrs. Hattie Johnson had a total income of $5,724.25 in 1951, of which $4,564.33 came from defendant's dividends. In 1952, the figures were $3,249.65 and $2,188, respectively. C. L. Brooke, the accountant who worked for defendant and who has shown his primary loyalty to the majority since this case began, was also the accountant for Mrs. Johnson and the Jennettes. There is every reason to believe, and we do believe (especially considering that he later gave defense counsel a confidential letter from a lawyer then representing Mrs. Johnson and Mrs. Jennette, without their permission), that he informed defendant's officers of the extent to which these ladies were dependent upon defendant's dividends.

Therefore, instead of going directly to them and making an offer for their stock, as had been done with the other minority shareholders, and perhaps also because of the ill feeling previously existing between them, not long after June 1, 1953, Bud Johnson, for the first time in his life, visited Charles Jennette at the place where he worked in Bossier City, Louisiana. He told Jennette about the stock purchase program, informing him that they had just completed buying the Harrel family stock at $350 per share. Strong emphasis was placed on the various details of the "dividend squeeze", but no offer to buy the stock of Jennette's wife or mother-in-law was made, for there was no need to do so. Defendant's officers knew full well what the response to this visit would be, and it was not long in coming. A few days later Mrs. Johnson went to Brown McCullough, her trusted adviser, to discuss the matter. She, a widow 67 years old, was almost desperate in her fear that the bulk of her income would be cut off. McCullough confirmed what Bud Johnson had told Jennette, but, as a part of the scheme,

refused to advise either sale or retention of the stock, recommending that she consult C. L. Brooke. Not long afterward, she and Mrs. Jennette did so; whereupon, Brooke played the trump card for defendant. Because it is of such great importance in the case, and shows graphically to what dastardly lengths defendant and its officers went in their succuessful quest for the minority stock, with all of its sure profits, we quote directly the following revealing excerpts from Brooke's sworn admissions while on the stand as a witness for defendant:

"Q. Mr. Brooke, let me ask you this: Did either Mrs. Johnson or Mrs. Jennette in their conversations with you prior to the sale of their stock indicate to you, or say to you, that the officials of the Mansfield Hardwood Lumber Company had said there would be a curtailment, or little or no dividends paid by the company in the future?

"And didn't you answer:

"A. Yes, they did. That was one of the things that caused me to make that calculation, and that does bring up another point which I remember; that Mrs. Johnson did say this: She said, 'What am I going to live on?' I said, 'Here is your situation, Mrs. Johnson: You must realize this fact, as a minority stockholder that you can't very well vote dividends. Buddy, Brown and Tom, they have salaries. Between Buddy and Tom, they can take care of their mother. What do you think are the chances of them taking care of you if dividends are curtailed?' And she said she felt that was one of the things that she had to consider. It was take it or leave it. Frankly, when she came back and told me she got four hundred dollars, I told her she was a good salesman.'

"That was your testimony, wasn't it?

"A. Yes, sir.

* * * * * *

"They came down to my office. They said that Mansfield was buying up stock. They wanted to sell their stock. They wanted to know— wanted to talk to me about it and get my advice on it. So, I told them both that I would figure with them but I would not advise them. I said, in effect, over the years of my life I have seen too many cases where a decision is made upon the basis of known quantities and later on something else happens.

* * * * * *

"During the course of our conversation, Mrs. Johnson or Mrs. Jennette, one of them, related it was their understanding that dividends would be curtailed. I don't remember whether they said for any period of years, long or short, or how much, but they would be curtailed.

* * * * * *

"There is one thing I think the Court should know. Maybe I am wrong, Mr. Cook, but in this conference, as the question of what would Mrs. Johnson live on—what would she have to live with if she didn't get any dividends, or if the dividends were curtailed, whichever it would be, I told her that that was one thing she would have to take into consideration. That was one of the purposes of making these calculations for her.

"I did tell her that she would have to take into consideration the fact that she and Mrs. Jennette together were minority stockholders and as far as I knew they would not be able to force the payment of dividends. From that standpoint there would be a possibility that they might sometime be forced to sell their stock, to use the common idiom, frozen out.

"The Court: They might be forced to sell for less than they are being offered?

"The Witness: Even less than they are being offered there."

That did it. After some further negotiations, defendant agreed to pay the ladies $400 per share for their holdings, partly in cash and the balance on terms of secured credit, the details of which

will be covered later. This transaction was completed on November 14, 1953. With this purchase, defendant had acquired 1,829 of the 2,085 minority shares it had set out to capture. The holders of the remaining 256 shares, for various reasons such as income tax complications, sentiment, lack of need for the money, etc., did not care to sell, or were to sell later. Not to be outdone by them, however, and in order to entice these stragglers into possible capitulation somewhere down the line, there was placed on defendant's minute book a standing offer to buy the remaining shares at $350 each, with the Board of Directors being empowered to pay more than that figure.

Now the majority had well over two-thirds of all outstanding stock which they needed to put defendant in liquidation whenever they should choose to do so. Now their well-laid plans were approaching fruition, for they were ready at last to start peddling its assets, to accomplish in fact their scheme of capturing for themselves the great values they had known were there all along.

Instead of instituting an intensive reforestation program, as promised to plaintiffs, Bud Johnson immediately laid off the company's T S I (Timber Stand Improvement) crews, who would have performed that work, and whose wages were about $200 per week. The ink was hardly dry on the papers representing the last minority stock purchase made on November 14, 1953, when he started out on the long-planned selling campaign. In late January or early February of 1954, he made his first contact, with Charles E. Wilds, superintendent of Woods Operation for the Brown Paper Mill at Monroe, Louisiana. A little later, on February 27, 1954, he made an appointment to meet with Earl Porter, an official of International Paper Company, on March 1, at Mobile, Alabama. International has two large paper mills in North Louisiana, at Bastrop and Springhill. On one occasion during the negotiations Johnson told Porter that defendant's timberlands were worth $10,000,000, and at another time he described their value as $100 per acre.

When he talked to Wilds, the discussion at the beginning dealt primarily with possible timberland exchanges, but when he saw that Wilds was not interested in this, he then told him in effect that defendant's timberlands were for sale. He testified that the purpose in contacting Porter not long thereafter was to promote competition between the two companies, hoping thereby to obtain better prices.

Nothing further was heard from Wilds, but negotiations with Porter continued, various plans being discussed, such as a possible merger, or with International purchasing all, or 80%, of defendant's stock, or outright purchase of its timberlands. About April 1, 1954, Porter tentatively indicated to defendant's officers that "it looks like about $8,000,000" would be a proper price for the timberlands. Bud Johnson replied, "That won't get it", and later on, after Brown McCullough had told him that $9,000,000 would buy them, Porter intimated he would recommend to his company that it pay $8,750,000. On April 9, 1954, evidently feeling that their sales efforts had proceeded so far that they could not get by with purchasing the remaining minority stock at $350 per share, and which might jeopardize the stock purchases already made, defendant's officers sent notices to these shareholders that the standing offer to buy at that price had been revoked, without explaining why.

After the officers showed considerable interest in the figures Porter had mentioned to them, International sent timber cruisers to inspect defendant's lands sometime in May or early June of 1954. While this appraisal was proceeding, it developed that International, for its own reasons, was not interested in a merger or in buying 100% of defendant's stock, and could not obtain a "partner" to purchase 20%, on the 80–20 basis which its tax experts had recommended, so the negotiations settled down to a proposition of a straight-out sale of the timberlands to International. Meantime, during the first week in April, the officers, Mrs. Long, and Mrs. Eleanor Johnson had met and agreed to sell out.

On August 16, 1954, the Internal Revenue Code of 1954, including Sections 331(a) (1) and 337(a), 26 U.S.C.A. §§ 331(a) (1), 337(a), became effective, providing that the double capital gains tax, on both the corporation and the stockholders in a liquidation, included in the 1939 Act, no longer would be applied, with only the liquidating shareholders being held liable. This new and unexpected development greatly benefited the majority's position, by cutting their potential tax liability almost in half, but according to their own testimony, they would have proceeded with sale of the corporate assets and liquidation even if this change in the tax law had not occurred.

On the opening day of the duck-hunting season, in early November, 1954, Bud Johnson and Tom Long were hunting at Caddo Lake, north of Shreveport. Evidently they had left word with Johnson's wife as to how they could be reached by telephone, and apparently were expecting a call from Earl Porter, for upon going to the Kool Point Lodge on the Lake, they received a message from Mrs. Johnson informing them that Porter wanted them to call him at Mobile. This was done. Porter advised them that he had recommended a higher figure to his company but that the maximum offer he was authorized to make was $7,700,000. This offer was turned down by Johnson and Long, while still talking to Porter, without consulting McCullough or any of the other stockholders, majority or minority. The reason given for such peremptory action was that the offer was entirely too low.

Soon after that incident, a meeting of the majority was held, following which Bud Johnson went to Boston to discuss a possible sale of the timberlands with officials of the Southern Advance Bag and Paper Company, which operated a large paper mill at Hodge, Louisiana. That company was quite interested in acquiring the timberlands, so serious negotiations for their sale got under way.

By the early part of July, 1955, an agreement had been reached for defendant to sell its lands to Robert Gair Company, with which Southern Advance Bag and Paper Company had merged, for $8,632,530.34, of which $4,832,530.34 was paid in cash, the balance secured by a mortgage note, payable in five years, with interest at 3% per annum. Excepted from the sale were the mineral rights underlying approximately 60,000 acres, which were to be distributed to the remaining shareholders pro rata. A special meeting of defendant's remaining stockholders was held on September 26, 1955, at which unanimous approval was obtained for sale of the timberlands, and a plan of liquidation of the company's other assets. The sale to Gair was closed finally on May 25, 1956. The prices received for the principal assets were as follows:

| | |
|---|---:|
| Zwolle Mill | $ 75,000.00 |
| Winnfield Mill | 285,000.00 |
| Stock of Mansfield Hardwood Lumber Company of Texas and Louisiana Builders Supply Company | 500,000.00 |
| Reader Railroad | 39,100.00 |
| Timberlands | 8,632,530.34 |
| Total | $9,531,630.34 |

The value of the mineral rights reserved for distribution to the remaining shareholders is not shown by the record, but it is obvious that they, together with the amounts of cash realized, will bring the total value of the liquidation to more than $10,000,000.

On the basis of that figure, if plaintiffs, as the owners of 1,567 shares, and the other minority stockholders whose shares were bought, totaling 262 (they not having joined in this suit, for reasons of their own), had not been fraudulently induced to sell their stock, they would be entitled to receive approximately $2,068 per share, less, of course, the amounts they have received already. This figure is the quotient of $10,000,000 divided by the original 4,836 shares. Unless plaintiffs succeed in having the sales of their stock rescinded, and are recognized as its equitable owners, the remaining 3,007

shares, 2,751 of which are held by defendant's officers and their immediate families, will receive approximately $3,325 per share, before taxes, or about $1,257 per share more than they would have gotten had plaintiffs not been eliminated as stockholders. Thus the majority collectively would profit from their own misdeeds, at the expenses of plaintiffs and the other minority shareholders who sold, by some $3,458,007. They would get this amount over and above $5,689,068 they legitimately should receive, being $2,068 for each of their 2,751 shares.

Meantime, when the story of the proposed sale to Gair appeared in the newspapers, in late July of 1955, typical of the reactions of the former minority shareholders were those of Max Brown and Allen Harrel. Brown immediately drove from Zwolle to Shreveport and presented Bud Johnson with a check for the amount he had received for his stock, asking that he and the others who had sold be permitted to repurchase their stock and share in the liquidation. Allen Harrel, who has been blind since early manhood, wrote Johnson a letter, which was so spontaneous and eloquent in its expression that we quote it in full:

"Mr. A. S. Johnson
"1166 Louisiana Avenue,
"Shreveport, La.

"Dear Bud:

"In view of the statements and the promises that you made to me at the time that you were trying to obtain our stock in M. H. L. Co. I was not only surprised but virtually dismayed to learn that you are now in the process of liquidating the company at an enormous profit to those that are left in the company. The statements referred to are that you wished to obtain this stock so that you could better cope with the tax situation by absorbing most of the earnings by paying it out in salaries and in that way avoid double taxation, that you and Tom were both young and both had children that would carry on the business and it would never be sold or liquidated, also because of the first reason mentioned that you would pay little or no dividends for a long time to come. One promise I especially remember was that you would not offer or pay anyone more than you were going to pay us. This promise was violated soon after you made it. These circumstances forced us to accept your offer and let you have what stock we had left. I feel that we have been wronged by your action in this matter and you are morally obligated to do something about it. The honorable thing to do would be for those of you that are left is to agree to compensate us for the sacrifice that we made in letting you have the stock. The company as it now is virtually a family affair so am sure that it would be an easy matter for you to get together on something like this. The price that you are getting for the company would enable you to do this and still leave all of you more than you could ever use and in the long run feel that your conscience would be a lots [sic] clearer than it will ever be if you do not do something about it. I am sure that it can be worked out from a tax angle also when the Revenue Department is informed that this is a way of taking care of those that sold because of statements and promises that you made. I do not know if you realize just how the M. H. L. Co. came into existence or not but it was first started back in 1901 when after your grandfather, Mr. Johnson failed in the mercantile business here my father and his sister, who was the wife of Mr. Johnson, put up money to start the Lewisville Lumber Co., they later moved to Stamps and thence to Louisiana. Both men that originally started this company have widows and children living and are certainly entitled to a better deal than they have gotten under the deal that they were virtually forced to

make with you. I hope that after you reflect over this matter and then consider the part that my father and Mr. Johnson had in bringing the M. H. L. into being and promoting it to the point where their successors took over, you and those connected with you will decide to do the right thing about it. Please let me hear from you as soon as convenient for you to do so. Personal regards to Brown, Tom and yourself.

"Yours very truly,
"J. A. Harrel."

Both Brown and Harrel immediately were turned down by Johnson, who tried to make it appear that what had happened was as if the company unexpectedly had "struck oil" on its properties—in suddenly discovering values never before known to exist. This response, in all of its untruthfulness, its grasping greed, and its moral bankruptcy, confirms in full measure our appraisal of the conduct of defendant's officers toward the minority. If, indeed, they had never known about the great value defendant's timberlands possessed, suddenly found so soon after acquiring plaintiffs' stock for a fraction of its liquidation worth, and if their motives were as pure as they would have us believe, they surely then would have done the decent thing by telling plaintiffs, in effect, "When we bought your stock, in all good faith we did not know how valuable the timberlands were, and we did not intend to sell. Now, however, just a few months later, we have a chance to sell at a handsome price. To prove our sincerity from the start, we want you to come back into the company, for there is more than enough for everyone to share." Instead, the response was as described, and to us it is as strong a proof as any other evidence before us

that these officers had meant to defraud the minority from the beginning. No other conclusion is admissible. We must find, therefore, that defendant's officers have been proven guilty of fraud, not merely by a preponderance of the evidence, but beyond a reasonable doubt.[1]

Human nature, with all of its foibles, being as it is, we find it hard to determine by just what process of rationalization defendant's officers anesthetized their consciences against the full implication of what they were doing. From all we know of them,[2] they otherwise are men of acumen and integrity. There is little question that Bud Johnson, the third-generation president, was the prime actor, the driving force, in all of this, but McCullough and Long went along with him in everything that was done. Probably they mistakenly regarded the matter as an arm's-length transaction in which they were free to drive a hard bargain, to use the "morals of the market place",[3] in their representations to plaintiffs. They and their predecessors had been in complete charge of defendant for so long that they unconsciously may have regarded the minority as non-productive nuisances, to be dealt with as such. They may have felt that, by tossing them a sop, the minority would not take the trouble to uncover the facts or have the courage to bring a suit, in effect against their own relatives, in vindication of their rights. Or, it may have been a question of sheer blind cupidity. Whatever it was, no chancellor in good conscience can allow their official action, directly in defendant's behalf and indirectly in their own, to stand unrebuked and unavoided.

Defendant's counsel, in brief, have argued that there are five essential ingredients which must be proven in order for a contract to be voided on grounds of fraud.[4] They are:

---

1. Belcher v. Booth, 164 La. 514, 114 So. 116; American Guaranty Company v. Sunset Realty & Planting Company, 208 La. 772, 23 So.2d 409, 430.

2. And as attested by character witnesses for whom we have the highest regard, but who admittedly knew little or nothing of the facts in this case.

3. Chief Justice Cardozo of the Court of Appeals of New York, in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1.

4. Citing Pence v. United States, 316 U.S. 332, 333, 62 S.Ct. 1080, 1083, 86 L.Ed. 1510.

1) A false representation;

2) In reference to a material fact;

3) Made with knowledge of its falsity;

4) With intent to deceive; and

5) With action taken in reliance upon the representation.

We accept counsel's contention as a sound statement of law, previously followed by this Court[5] and by the Courts of Louisiana,[6] and as directly applicable here. It is clear, in the light of the facts detailed above,[7] that all of these five elements have been proven by plaintiffs to

the hilt; and that, unless one or more of the special defenses are good, plaintiffs are entitled to the equitable relief they seek.[8]

 Moreover, even if defendant's officers had not been proven guilty of actual fraud in the many respects shown, defendant still would be liable for breach of the fiduciary obligations of its officers, in failing to advise plaintiffs fully, frankly and faithfully as to the important, material facts which were in the officers' possession. This amounted to constructive fraud.[9]

---

5. Rountree v. United States, D.C., 49 F. Supp. 840.

6. Garnier v. Aetna Insurance Company, 181 La. 426, 159 So. 705, 707; American Guaranty Company v. Sunset Realty & Planting Company, supra.

7. In determining the facts, as related, we have looked to what was done, as well as to what was or was not said. "Behavior rather than words among men and women is most significant in ascertaining intent." Speed v. Transamerica Corporation, D.C., 99 F.Supp. 808, 821.

8. Westwood v. Continental Can Co., Inc., 5 Cir., 80 F.2d 494, 498:

"We are satisfied that when directors or other officers step aside from the duty of managing the corporate business under the charter for the benefit of stockholders, *and enter upon schemes among themselves or with others to dispose of the corporate business and to reap a personal profit at the expense of the stockholders by buying up their shares without full disclosure and at an inadequate price, there is a breach of duty. If the corporation ought to cease business, the stockholders may so decide and take steps to share the assets. If a favorable opportunity arises to sell out, the stockholders and not the managing officers are entitled to have the benefit of it.*" (Emphasis supplied.)

The Court went on to declare that such action is a violation, not only of the private rights of the stockholders, but of *public policy.* 80 F.2d 498.

9. Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503; Markey v. Hibernia Homestead Association, La.App., 186 So. 757, 763, and authorities cited, quoted at length in our former opinion at 143 F. Supp. 839; Zahn v. Transamerica Corporation, 3 Cir., 162 F.2d 36, 42, 43, 172 A.L.R. 495; Seagrave Corporation v.

Mount, 6 Cir., 212 F.2d 389, 396, 397; Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Speed v. Transamerica Corporation, supra; Lebold v. Inland Steel Company, 7 Cir., 125 F.2d 369.

Some of the material facts which admittedly were not disclosed to plaintiffs by defendant's officers, detailed above and here briefly recapitulated, are:

1) The $5,000,000 offer, for 55% of defendant's timberlands, made by R. O. Martin to Bud Johnson in 1952;

2) The instructions given to C. L. Brooke, in 1952, to assume that defendant's assets possessed a value in excess of $9,000,000;

3) The opinion of W. C. Postle, defendant's Chief Forester, in 1953, that its timberlands then had a market value "in the neighborhood of a hundred dollars an acre", which the officers knew about;

4) The letters containing tax advice, written by Brooke on August 29 and October 14, 1952, wherein contemplated plans for sale of defendant's assets, liquidation, merger, stock sales, etc., were discussed;

5) The officers' secret consideration of various plans of liquidation, reorganization, merger, etc., before the stock-buying program was begun.

See also 36 C.J.S. verbo Fiduciary p. 746:

" * * * It is a well-settled equitable rule that anyone acting in a fiduciary relation shall not be permitted to make use of that relation to benefit his own personal interest, except with the full knowledge and consent of the other person, and such other person must be in possession of all his powers before he can be bound by that knowledge or consent. *When a fiduciary relation is established between parties, courts of equity scrutinize very closely any trans-*

The Fifth Circuit Court of Appeals in Commercial National Bank in Shreveport v. Parsons, 144 F.2d 231, 238–239, had the following to say on this subject:

"Where the directors of a failing bank form a new bank and in effect pledge to themselves every asset of the old bank, a court of equity should scrutinize the contract with great care and strike down every oppressive and overreaching provision. *This is true even though the stockholders ratified the contract, because the parties were not on an equal footing and the directors occupied a position of trust and confidence.* The old shareholders were given the option to take stock in the new bank; but for many of them doubtless this was impossible, as very few availed themselves of the option. The contract should have been drawn so as to treat both groups fairly. *The directors* had the advantage of an intimate knowledge of the old bank's condition, which the ordinary stockholders did not have. A hard bargain driven by fiduciaries in such circumstances is presumed to be fraudulent and void. 25 C.J. 1118, 1119, 1120. The law of fiduciaries would be futile if it lacked the capacity to correct abuses arising out of the relation of trust and confidence existing between the directors of a corporation and its stockholders." (Emphasis supplied.)

Another ground fully justifying recovery by plaintiffs under Louisiana law, and established by undisputed facts, is that the consideration they received for their stock—less than 20% of its liquidated value—was not serious, within the meaning of that term as expressed in the L.S.A.–Civil Code, and as interpreted by the Louisiana jurisprudence.[10]

---

*action between the parties by which the dominant party secures any profit or advantage at the expense of the person under his influence. All transactions between parties in this relation are presumptively fraudulent and void, and the burden of proof is on the party asserting validity with respect thereto.*" (Emphasis supplied.)

See also 37 C.J.S. verbo Fraud § 2 p. 211, et seq.:

"Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.

 \* \* \* \* \*

"Constructive fraud usually arises from a breach of duty where a relationship of trust and confidence exists.
\* \* \*

"A fiduciary relation exists: Wherever confidence on one side results in superiority and influence on the other side; where a special confidence is reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence; where confidence is reposed and accepted, whether the origin is moral, social, domestic, or merely personal; or where a person has knowledge and authority which he is bound to exercise for the benefit of another person."

10. Article 2464 of the L.S.A.–Civil Code of Louisiana reads in pertinent part:

"It [the price of the sale] ought not to be out of all proportion with the value of the thing \* \* \*."

In Murray v. Barnhart, 1906, 117 La. 1023, 42 So. 489, 491, the Court said:

"\* \* \* At common law 'the slightest consideration is sufficient to support the most onerous obligation. The inadequacy, as has been said, is for the parties to consider at the time of making the agreement, and not for the court when it is sought to be enforced.' 9 Cyc. 365; A. & E. E. vol. 6, p. 694. *But under our law the consideration 'must be serious':* 'it must not be out of all proportion with the value of the thing.' Article 2464, Civ.Code. That article has special reference to the price of a sale, but the principle it involves is not peculiar to sales. It is a general principle of the civil law, and as old as the civil law itself. The example given by Ulpien as an illustration of it is not that of a sale, but, as happens, is that of a lease: "'Si quis conduxerit nummo uno, locatio nulla est; quira hoc donationis instar obtinet.' L. 46 Dig. f. f. Loc.Cond.; Pothier, Vente, Nos. 18 and 19; Merlin, Rep. Vo. Vente, § 1, art. 2, No. 1; Durantor, T. 16, No. 100; Troplong, Vente,

In this connection, the evidence shows that the values of defendant's assets, when the remaining stockholders voted to liquidate in 1955, and upon their actual sale in 1956, had not changed materially from those existing in 1953, when plaintiffs' stocks were bought.[11]

Pomeroy's Equity Jurisprudence, Volume 3, Section 927, pp. 634–638, declares:

"Although the actual cases in which a contract or conveyance has been cancelled on account of gross inadequacy merely, without other inequitable incidents, are very few, yet the doctrine is settled, by a consensus of decisions and *dicta*, that even in the absence of all other circumstances, when the inadequacy of price is so gross that it shocks the conscience, and furnishes satisfactory and decisive evidence of fraud, it will be a sufficient ground for canceling a conveyance or contract, whether executed or executory. *Even then fraud, and not inadequacy of price, is the true and only cause for the interposition of equity and the granting of relief.*

\* \* \* \* \* \*

"The following seems to be the true rationale of the doctrines concerning inadequacy of price: Whenever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion or reason for interference by courts, for owners have a right to sell property for what they please, and buyers have a right to pay what they please. But where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the *fact* of fraud. *Such a gross inadequacy or disproportion will call for explanation, and will shift the burden of proof upon the party seeking to enforce the contract, and will require him to show affirmatively that the price was the result of a deliberate and intentional action by the parties; and if the facts do [not] prove such action, the fact of fraud will be more readily and clearly inferred.*" (Emphasis supplied.)

■ While vigorously denying that defendant's officers committed fraud, either active or constructive, in their dealings with plaintiffs, defendant's counsel argue alternatively, and at length, that defendant still may not be held liable because there was no resolution of record, by its stockholders or directors, authorizing the officers to do what they did; nor was anything done by the corporation itself which ratified their action. In other

---

No. 149; Marcade on articles 1591 and 1592, C. N.

"In such a case the presumption is that the parties did not intend that the *trifle* named should ever be paid at all, and the situation is looked upon as being as if no amount had been named. \* \* \*" (Emphasis supplied.)

Later, in 1928, the same Court, in Blanchard v. Haber, 166 La. 1014, 118 So. 117, 119, said:

"Under the civil law, as at common law, it is not necessary that the consideration received or to be received for incurring an obligation shall be an equivalent consideration. The question of adequacy of the consideration is a matter for the parties themselves to determine. But, while at common law any lawful consideration for a contract is deemed sufficient, the civil law requires that the *consideration must be serious* and not altogether out of proportion to the obligation. Article 2464 of the Civil Code so provides, specifically, for the contract of sale; and in Murray v. Barnhart, 117 La. [1023] 1030, 42 So. 489, it was held that the doctrine of the civil law in that respect, being as old as the civil law itself, was applicable, not only to contracts of sale, but to all other contracts." (Emphasis supplied.)

To the same effect are Hirsch v. Rosenberg, La.App., 14 So.2d 331; Shreveport Laundries v. Teagle, La.App., 139 So. 563; Spanier v. DeVoe, 52 La.Ann. 581, 27 So. 174, and D'Orgenoy v. Droz, 13 La. 382. See also Cali v. National Linen Service Corp., 5 Cir., 38 F.2d 35.

11. Haas v. Cerami, 201 La. 612, 10 So.2d 61; Ronaldson & Puckett Company v. Bynum, 122 La. 687, 48 So. 152.

words, they, say that defendant's officers committed no fraud, but *if* they did, it was *ultra vires* and defendant is not liable because it had not given them prior authority to defraud, and did not later ratify their misdeeds, either expressly or impliedly. This is indeed a tenuous argument, unsupported in fact and reprobated by the weight of legal authority.

The argument is factually inaccurate in that the record shows, without dispute, that defendant's officers were in complete control of defendant, with apparent authority to do anything they pleased. They *were* the company, as shown by Bud Johnson's testimony:

"Q. Is it your testimony, Mr. Johnson, that you didn't think the Board of Directors of Mansfield would be interested in the fact that you had been receiving communications from a tax accountant referring to the possibility of a liquidation of Mansfield, such as was accomplished in the Frost-Olin transaction? A. That was never brought before the Board of Directors— never brought before the stockholders. We who were in the active management of the company never gave it any thought whatsoever. Consequently, it was not brought up.

"Q. You don't think your Board of Directors was in active management of your company? A. Not from operating.

"Q. Whom did you have in mind when you said active management of the company? A. Those who were in the operation of the company, working with it every day.

"The Court: You mean the officers?

"The Witness: Yes, sir.

"By Mr. Woods: Q. Yourself, Mr. McCullough and Mr. Long? A. Yes, sir."

They not only had apparent authority, but had actual authority by their ownership and proxy control of more than 56% of the stock. On September 15, 1953, with full knowledge of the fraud they had committed against the other minority stockholders, and were about to commit against Mrs. Hattie Johnson and Mrs. Jennette, they voted these majority stock interests in favor of approving the company's purchase of all stock theretofore acquired, and to authorize the Board to approve purchase of Mrs. Johnson's and Mrs. Jennette's stock a little later. Defendant thereby expressly ratified all that was done, for the knowledge of its officers and majority stockholders was its knowledge. Moreover, defendant still ratifies the officers' conduct toward the minority by its insistence, before and since this suit was brought, that its purchase of the stock was valid, binding and final.

Legally, if defendant's argument were correct, it would be impossible for anyone, stockholder or otherwise, to recover from a corporation on the ground of fraud committed by its officers or agents, because no group of stockholders or directors would be foolish enough expressly to authorize or ratify such fraud. The correct rule of law, applicable here, is found at 13 American Jurisprudence 1050 et seq., verbo "Corporations", § 1125:

"*Fraud and Misrepresentations.*— The general rule that a principal is liable for the fraud and misrepresentation of his agent while acting within the scope of his authority or employment is fully applicable to corporations. Corporations may be held liable for the fraud and deceit of their officers and agents acting within the scope of their corporate authority or employment. It is true that as a mere legal entity a corporation can have no will, and cannot act at all, but in its relations to the public it is represented by its officers and agents, and their fraud in the corporate course of dealing is in law the fraud of the corporation. *What is more, a corporation is not relieved from liability for the fraudulent acts of its officer within the apparent scope of his authority by the fact that the officer in committing the fraud is acting for his own benefit*

*and the fact that the corporation does not profit by it. The reason given for the corporation's liability in such case is that although the fraud is for the officer's own benefit, the officer is placed in such a position by the corporation that as its agent he has the power to commit the wrong, and therefore it should bear the burden of his wrongdoing."* (Emphasis supplied.)

The Fifth Circuit Court of Appeals in Kohler v. Jacobs, 138 F.2d 440, 442, 443, in dealing with a situation very similar to this one, ruled as follows:

" * * * As to the Corporation, it is true that it owes the stockholder no duty of disclosure when he trades with others in its stock, and since he has access to the corporate books diligence might well lead him to them when he desires information from the Corporation. But if a corporation (which ordinarily does not deal in its own stock) for its own lawful purposes sets out to buy shares through its managing officers, and they by intentional misrepresentation and concealment deceive a selling stockholder who is ignorant of the truth, though he be an inactive director who ought to know, so that he is damaged, *we see no reason why the corporation is not bound for the consequences. The deceit practiced by the corporation's high officers in the corporation's business and for its benefit must be taken to be a corporate act, and not ultra vires.* 19 C.J.S. Corporations, § 1278(a) (b); 13 Am.Jur., Corporations, § 1125. * * *" (Emphasis supplied.)

The Louisiana Supreme Court, in American Guaranty Company v. Sunset Realty & Planting Company, supra, held (23 So.2d 451):

"An innocent principal cannot be exonerated from the fraud of his agent acting within the scope of his employment. Henderson et al. v. Western Marine & Fire Insurance Co., 10 Rob. 164, 43 Am.Dec. 176.

*"Where an agent acts beyond the scope of his authority but the principal accepts and insists on retaining the benefits and advantages of the fraudulent transaction, this constitutes a ratification.* The Federal Court in Great American Indemnity Co. v. First National Bank, 10 Cir., 100 F.2d 763, 765, in discussing the foregoing subject, stated:

" 'In such a case the principal is impaled on the horns of a dilemma. If he disclaims the agent's act as unauthorized, he has no grounds to retain the fruits thereof; on the other hand, if he retains the fruits of the agent's act, after knowledge of the facts, he must in fairness be charged with the agent's knowledge. Maryland Casualty Co. v. Queenan, 10 Cir., 89 F.2d 155, 156, 157.' " (Emphasis supplied.)

We must hold, accordingly, that this defense is without merit and must be rejected.[12]

▮▮▮ Defendant further specially contends that the representations made by its officers to plaintiffs, that there were no present or future plans for sale or liquidation of its assets, were merely promissory and, therefore, unenforceable, being nothing more than an expression of future intent. Considering the facts we have found, this contention is so clearly unmeritorious as not to warrant extended discussion, the complete answer being found in the following quotations of authority:

23 American Jurisprudence 798 et seq., verbo "Fraud and Deceit", §§ 37, 38, 41:

---

12. To the same effect as the quoted authorities are 19 C.J.S. verbo Corporations § 1278, p. 955 et seq.; Standard Oil Co. of Kentucky v. Gunn, 234 Ala. 598, 176 So. 332; Woodruff v. Bates, 210 Miss. 894, 50 So.2d 559; Koontz v. Sharon, 109 Mont. 180, 94 P.2d 668; State on Inf. of Taylor v. American Insurance Company, 355 Mo. 1053, 200 S. W.2d 1, 41; Sawyer v. Mid-Continent Petroleum Corporation, 10 Cir., 236 F. 2d 518, 520.

" * * * According to the weight of authority, if the person making the statement as to a future event is guilty of an actual fraudulent intent, and makes the misrepresentation with the intention of deceiving and defrauding the other party, and accomplishes this result, to the latter's injury, fraud, may under many circumstances, be predicated thereon, notwithstanding the future nature of the representation. This result is reached frequently on the theory that a person's intention or belief is a matter of fact and that, therefore, if a misrepresentation is made with regard to the same, the misrepresentation is one of fact. False representations as to future events will constitute fraud, where these events depend upon the acts of the party making the representations and form the inducement whereby the other party is led into the transaction, or where the speaker knows that his hearer understands him to mean that facts within his knowledge warrant the expectations he is raising. * * *

* * * * * *

"Where a promisor has no intention of performing his promise when it is made, in the view taken by a majority of courts, a fraud has been committed by deliberate deception and false pretense. Such cases rest upon an entirely different basis for the predication of fraud from that which would be possible in cases of promises honestly made, but subsequently unfulfilled.

* * * * * *

"The weight of authority holds that if the falsity of the statement can be established, a misrepresentation of intent is an actionable representation of fact. A statement by a speaker as to what he intends to do may import a statement of fact, that is, as to his present intention; and if his expressed intention is merely feigned in order to mislead, a charge of fraud may be predicated thereon.

It has been stated that *to profess an intent to do or not to do where the speaker intends the contrary is as clear a case of misrepresentation and of fraud as can be made.*

* * * * * *

"Fraud may, in a majority of jurisdictions, be predicated on the nonperformance of a promise in certain cases where the promise is the device to accomplish the fraud, the most frequent example of such a fraudulent promise being a promise made without any intention of performing it at the time of making it, or where a relation of trust and confidence exists between the parties.

* * * * * *

"If a promise is accompanied with statements of existing facts which show the ability of the promisor to perform his promise, without which the promise would not be accepted or acted upon, such statements are denominated representations and, if falsely made, are grounds of avoiding the contract, although the thing promised to be done lies wholly in the future. It has been said that where a promise is inseparably linked with a misrepresentation of an existing fact, the breach may be the subject of a claim, and that even if reliance is placed upon the mere promises of the defendant, as well as upon his false representations, nevertheless a cause of action for fraud may be maintained provided the representations have had a material effect in accomplishing the deception, since it is not necessary that they shall have been the sole inducing cause. * * *" (Emphasis supplied.)

37 C.J.S. verbo Fraud § 11, p. 234, et seq.:

"*Limitations and qualifications of rule.* In the application of the general rule that fraud cannot ordinarily be predicated on unfulfilled promises or statements as to future events, exceptions or limitations have arisen; it is not the rule that all false repre-

124

sentations as to future events, or all unperformed promises, are nonactionable. The rule as to a promise made with the intention of not performing it is considered infra § 12. *The fact that statements relate to the future will not preclude liability for fraud if such statements were intended and accepted as representations of fact and involved a matter peculiarly within the speaker's knowledge,* or as to which he professed to have special knowledge, or *if artifice was used to prevent the hearer from learning the truth; nor will redress be refused if the promises or predictions also involve, or are coupled with, a misstatement or concealment of existing facts, as where the prediction or promise necessarily includes a misstatement of the existing facts on which it is based, * * *.*

"Where a relation of trust and confidence exists between two parties, so that one of them places peculiar reliance in the other's trustworthiness, the latter is liable for representations as to future conduct, and not merely as to past facts.

"*A future promise may be fraudulent when it is part of a general scheme or plan, existing at the time, to induce a person to act, as he otherwise would not, to his injury.*" (Emphasis supplied.)

This defense, therefore, must be rejected.

█ We next consider defendant's contention that all plaintiffs are guilty of laches—in waiting too long to bring this action after they learned that defendant would be liquidated. Max Brown learned of it on July 2, 1955, in a telephone call from Bud Johnson. The other plaintiffs first discovered that the timberlands would be sold in late July or early August, 1955, when stories to that effect appeared in the newspapers. Neither the news stories, nor the call from Johnson to Brown, informed plaintiffs as to the price defendant would receive for the timberlands, and it was months later before plaintiffs found out what prices the other assets would bring. It was not until the stockholders' meeting on September 26, 1955, that plaintiffs learned of the approximate price to be paid by Gair for the timberlands. Three days later, on September 29, 1955, defendant executed its contract of sale to Gair, which was consummated by the actual sale on May 25, 1956.

Meanwhile, on July 9, 1955, one week after receiving the telephone call from Johnson, Max Brown came to Shreveport, bringing his check for $22,750 payable to defendant, the amount he had been paid for his stock, and requested that he be permitted to "come back into the company". In August, Allen Harrel wrote Johnson the letter quoted above, approximately to the same effect. Both of these requests were summarily rejected by defendant, for the ridiculous reasons we have shown.

Sometime in August, Mrs. Hattie Johnson, Mrs. Jennette and the Harrels consulted Whitfield Jack, an attorney in Shreveport, who conferred with C. L. Brooke about the matter. Of course, Brooke did not disclose to Mr. Jack the highly important information he had in his possession, such as his having written defendant the tax letters on August 29 and October 14, 1952, his instructions to assume therein that defendant's assets were worth in excess of $9,000,000, etc.; but it is equally certain the Brooke told defendant's officers about Jack's inquiries, and probably then delivered Jack's letter of September 7, 1955, to them.

On the basis of the meager information then at hand, Mr. Jack advised his clients that, notwithstanding "the dirty aspects" of the case, he could not do anything for them until more facts were developed, recommending that detectives be hired in an effort to uncover them. In late December of 1955, or early January of 1956, plaintiffs contacted Mr. J. Will Patton, Jr., an attorney at Lewisville, Arkansas, who in turn associated plaintiffs' present Shreveport counsel, after first obtaining a release from Mr. Jack. Intensive investigation was begun, which

ultimately turned up many of the facts shown in this record, many others being developed, however, through discovery proceedings conducted after suit was filed on June 22, 1956, less than one month following the sale to Gair, who paid off the balance due on the purchase price shortly after May 25. Defendant almost immediately distributed the proceeds to its remaining shareholders, so that only about $1,300,000 remained in its hands when the suit was filed, and further distribution was halted by our restraining order.

Defendant's counsel argue that plaintiffs should have filed suit before the stockholders' meeting on September 26, 1955, and thus have prevented defendant from changing its position. Having practiced law for about twenty years prior to appointment to the Bench, and considering the nature of this case, we know that it would have been virtually impossible for plaintiffs to have developed sufficient corroborating facts, in support of their own testimony, to have justified them, as responsible people, in filing this suit within the short period intervening between the time they obtained their first knowledge of the proposed liquidation and the date of the stockholders' meeting. Moreover, as noted, it was not until this meeting that they learned of the price to be paid for the timberlands, and since the sales contract was executed only three days later, plaintiffs still had not had time to marshal their facts. By then the die had been cast for liquidation and all that remained to be done was for defendant to convey title to the lands, as it did after Gair's attorneys had approved it.

Plaintiffs' counsel, as responsible, ethical members of the Bar, surely could not have been expected to file a suit based on fraud before they had obtained sufficient evidence in corroboration of their clients' version of the facts. This took time, but not too much time at that, for they had uncovered enough facts to justify their action herein, and filed the suit, within less than a year from the first notice plaintiffs received as to their having been defrauded.

On the basis of these facts, let us examine the applicable rules of equity. 19 American Jurisprudence 338–353, verbo "Equity", §§ 489–509, in a discussion of the doctrine of "Laches", lays down the following pertinent rules:

"Suit to enforce an equitable claim or cause of action may be held to be barred by the complainant's laches or procrastination in the assertion of his right or equity, *where the institution of suit has been delayed during a 'unreasonable' period of time*. It is said that 'reasonable diligence' is essential to call into action the powers of a court of equity.

\* \* \* \* \* \*

"The basis of the doctrine of laches is said to be public policy which requires, for the peace of society, the discouragement of *stale* demands.

\* \* \* \* \* \*

"The concept imported by the term 'laches' is fundamental to the notion of responsibility in general; and it finds expression in a variety of other words, one very commonly used being 'negligence.' It is said that 'laches is negligence or omission seasonably to assert a right.' The idea is embodied also in the words 'acquiescence,' 'election,' 'estoppel,' 'abandonment,' 'ratification,' and 'waiver.'

\* \* \* \* \* \*

*"While a Federal court sitting in equity is not bound by the state statute of limitations, it will be guided thereby, ordinarily, in determining the question as to whether the suit should be dismissed because of laches.*

\* \* \* \* \* \*

"A suit is held to be barred on the ground of laches or stale demand where *and only where* the following facts are disclosed: (1) Conduct on the part of the defendant, or of one under whom he claims, giving rise to the situation of which complaint is made and for which the complainant seeks a remedy, as, for example,

an invasion by the defendant of the complainant's right, such as the right to the possession of property; (2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit; (3) *lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit; and* (4) *injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is not held to be barred.*

"The adjudicated cases 'proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that *by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that, because of the change in condition of relations during this period of delay, it would be an injustice to the latter to permit him now to assert them.'*

\* \* \* \* \* \*

"The question as to whether the elements of laches have been established in any particular case is, of course, one of fact and calls for the exercise of a sound discretion by the trial court.

\* \* \* \* \* \*

" \* \* \* The fact that the complainant has delayed to bring suit will *not alone* be held to have barred him of relief. While laches is often spoken of as the equitable equivalent of the legal statute of limitations, yet there is no fixed time which makes it an absolute bar. The period establishing laches is not 'one which can be measured out in days and months as though it were a statute of limitations.' The determination of the question as to laches vel non proceeds in the light of the circumstances of the case. *What might be inexcusable delay in one case would not be inconsistent with diligence in another.*

\* \* \* \* \* \*

"The third of the constituents of laches is injury or prejudice to the defendant in the event relief is granted to the complainant. A correct statement is that *the doctrine of stale demand applies only where, because of lapse of time, 'it would be inequitable to allow a party to enforce his legal rights.'*

\* \* \* \* \* \*

"*If prejudice will not be occasioned to the defendant as a result of the assertion of the complainant's right, laches is not predicable of delay attending the commencement of the suit.* \* \* \* " (Emphasis supplied.)

The Fifth Circuit Court of Appeals, in accordance with the rules just quoted, has held, in United States v. Alex Dussel Iron Works, 31 F.2d 535, 536:

" \* \* \* Laches consists of two elements, *inexcusable delay* in instituting suit *and prejudice* resulting to the defendant from such delay. Its existence depends upon the equities of the case, and not merely upon the lapse of time. \* \* \* Differing from prescription, *time alone is not enough to show laches. The circumstances and the equities of the parties must be as well considered.* The Key City, 14 Wall. 653, 20 L.Ed. 896. \* \* \* " (Emphasis supplied.)

The Supreme Court of Louisiana, in Labarre v. Rateau, 210 La. 34, 26 So.2d 279, 284, puts it this way:

"The doctrine of laches, equitable in character and fully discussed in 30 C.J.S. verbo Equity § 112 et seq., 'is based on the injustice that might result from the enforcement of long neglected rights, the difficulty, if not the impossibility, of ascertaining the truth of the matters in controversy and doing justice between the parties, and on grounds of public

policy, its aim being the discouragement, for the peace and repose of society, of *stale and antiquated demands.'* 30 C.J.S. Equity § 113. *What constitutes laches is to be determined in the light of the circumstances of the particular case.* The doctrine's application is controlled by equitable considerations; *it cannot be invoked to defeat justice; it will be applied only where the enforcement of the right asserted would work injustice.* 30 C.J.S. Equity § 115. *While delay in enforcing a right is an element of laches, such delay does not of itself constitute laches.* \* \* \* " (Emphasis supplied.)

Applying these principles to the facts detailed, it is perfectly clear to us that plaintiffs have not been guilty of laches so as equitably to bar their right of recovery here. They did not delay taking action for an "unreasonable" time. Defendant had notice well before the stockholders' meeting of September 26, 1955, that plaintiffs were contending they had been defrauded and intended to do something about it, some of them even having employed an attorney to assert their rights. By no means could defendant have concluded that plaintiffs' claims were being "abandoned", so as to lull it into a false sense of security. On the contrary, it is most apparent that the officers knew plaintiffs were outraged by their conduct and that they, the officers, were almost literally racing to close the deal with Gair at the earliest possible time.

Moreover, defendant has not been "prejudiced" in any sense by the suit not

having been filed sooner. As we have stated in this record before, in passing upon preliminary motions, true it may have been that defendant changed its position after plaintiffs became aware that it would be liquidated. Yet, its change of position—the very thing that plaintiffs complain about—resulted in no disadvantage to the corporation itself, which, according to plan, would have transferred all of its property and have been dissolved, had it not been brought to a halt by this lawsuit. The change, rather, was intended to be, and actually was, to the considerable advantage of the majority shareholders, and to the substantial disadvantage, and at the expense of these plaintiffs. That, verily, is what this suit is all about.

For these reasons, we find the plea of laches to be totally without merit [13] and it is rejected.

Defendant argues that Mrs. Hattie Johnson and Mrs. Jeanette Jennette have ratified and condoned its fraud, committed in the purchase of their stock, and are estopped now to attack the transaction and rescind the purchase contracts, by having accepted payments from defendant after learning of the fraud in late July or early August, 1955.

When they sold their stock to defendant on November 14, 1953, they were paid about one-third of the purchase price in cash, and for the balance were given defendant's installment notes, payable serially on November 1st and May 1st of each year, secured by a mortgage on approximately 11,000 acres of defendant's lands. The notes held by Mrs. Jen-

13. We also are strongly impelled to this view by the fact that the suit was filed well within the one-year period of limitations—prescription—provided for by Louisiana law, in L.S.A.–Civil Code Articles 3536 and 3537, for the enforcement of actions based on fraud. Thomas v. Whittington, 127 La. 551, 53 So. 860; Lutz v. Forbes, 13 La.Ann. 609. This one-year period dates from the discovery of the fraud. See Reardon v. Dickinson, 156 La. 556, 100 So. 715, 717:

"The plea of prescription is manifestly untenable under the facts of this case.

The petition alleges and the evidence establishes that the plaintiffs did not discover that a fraud had been practiced on them until May, 1920, and the suit was filed in less than a year thereafter. As a matter of fact, while the false representations were made and the stock was issued to the plaintiffs more than a year before the suit was filed, the actual loss and damage only occurred within the year preceding the filing of the suit."

See also Amen v. Black, 10 Cir., 234 F.2d 12, 15, and authorities therein cited.

nette extended over a period of ten years, and those held by Mrs. Johnson were for fifteen years. They contained a call privilege whereby, on thirty days' notice, and upon paying 2% on the principal balance due, defendant could retire them in advance of their maturities.

These notes were kept in their lock boxes at the Fairfield Avenue Branch of the Commercial National Bank in Shreveport. As they fell due, defendant would make payments at the bank, which in turn would notify the payees that this had been done. They then would go to the bank, take all the notes from the lock boxes, present them at the Note Teller's window, receive payments of principal and interest due, and surrender the maturing notes for cancellation, with interest payments being credited upon the remaining notes, not yet due.

Each of them surrendered, and was paid for serial installment notes falling due on November 1, 1955, and May 1, 1956. On May 25, 1956, they were notified that all remaining notes would be called and paid at once, whereupon they required defendant to give the thirty-day call notice, thereafter being paid on June 25, 1956, after first delivering to the bank, for transmission to defendant, a letter notifying defendant that they would insist upon their rights in this suit, which were not being waived or surrendered in any way.

When the payments of November 1, 1955, and May 1, 1956, were received and accepted, neither Mrs. Johnson nor Mrs. Jennette had consulted counsel about them, although in November they were represented by Whitfield Jack, and in May by present counsel, who wrote the letter to defendant for them to sign and deliver to the bank, before acceptance of the payments made on June 25.

There is not the slightest evidence in this record, other than the bare acts of receiving payments as outlined, which would indicate that these ladies had any intention of surrendering their rights or of ratifying or condoning the fraud committed by defendant's officers in acquiring their stock. On the contrary, defendant knew full well that they had employed counsel, and that a lawsuit attacking the stock purchase probably could be expected at almost any time. Defendant was not injured in any way by what was done and did not change its position because of this. In the accounting which will be ordered, it will be entitled to receive credit against its indebtedness to these ladies, for the full amounts they have received.

In Louisiana,[14] and else-

---

14. International Accountants Society v. Santana, 166 La. 671, 117 So. 768, 769, 770, 59 A.L.R. 276:

"* * * To execute voluntarily is to execute with the intention to confirm and ratify. Celeste Sugar Co. v. Dunbar-Dukate Co., 160 La. 694, 107 So. 493; Augustin v. Farnsworth, 155 La. 1053, 99 So. 868; Sims v. Jeter, 129 La. 262, 55 So. 877. In either case the intention to ratify by the party against whom the act is opposed must be clearly and unequivocably shown. Celeste Sugar Co. v. Dunbar-Dukate Co., supra; Wells v. Files, 136 La. [125], at page 133, 66 So. 749; Sims v. Jeter, supra; Breaux v. Sarvoie, 39 La.Ann. 243, 1 So. 614. No intention to ratify will be inferred when the act can be otherwise explained. Sims v. Jeter, supra. And in case of doubt the party against whom ratification or voluntary execution is claimed must have the bene-

fit of the doubt. Succession of Easum, 49 La.Ann. 1345, 22 So. 364.

"The burden of proving the ratification or voluntary execution of the contract is on the plaintiff. Rivas' Heirs v. Bernard, 13 La. 159, 175. * * *" (Emphasis supplied.)

. Selber Bros. v. Newstadt's Shoe Stores, 203 La. 316, 14 So.2d 10, 13, 14:

"Estoppel, as a general rule, is effective only when it appears that the person pleading it has been misled to his injury by acts of omission or commission of him who is sought to be estopped; and it is not favored in law and should not be maintained except in clear cases. Louisiana Oil Refining Corporation v. Williams et al., 170 La. 218, 127 So. 606; Tyler v. Walt et al., 184 La. 659, 167 So. 182; Succession of Butterworth, 195 La. 115, 196 So. 39.

"In the instant case, the cashing of the checks, representing the minimum rental for the mentioned four months'

where,[15] the universal rule is that in order for there to be a ratification or an estoppel, by conduct such as this, the burden of proof rests upon the one claiming ratification to show, by clear, convincing and unequivocal evidence, that, with full knowledge of *all* the facts, there was an *intention to ratify and to surrender* their rights, on the strength of which defendant has relied and acted to its detriment.

The Fifth Circuit Court of Appeals, in Union Producing Company v. Pardue, 117 F.2d 225, 227, rejected a plea of estoppel and ratification where gas royalty payments were received by the plaintiff from defendant in amounts less than

period, was in no manner misleading and prejudicial to defendant. There was nothing to prompt a belief by the latter that the rent dispute had been terminated and to cause it to assume a position inimical to its best interests. *To the contrary, defendant was repeatedly informed and knew all along that plaintiff was claiming rental in addition to the minimum payments.*

"But defendant urges, under the discussed special plea, that the acceptance of the minimum amounts resulted in what is termed an accord and satisfaction and that plaintiff is now estopped to collect the excess rental. In support of that position it cites and relies on Meyers v. Acme Homestead Association, 18 La.App. 697, 138 So. 443, and Berger v. Quintero, 170 La. 37, 38, 127 So. 356. In each of those cases, as we appreciate the facts thereof, there accompanies the delivered check a written declaration of the obligor that the payment constituted full settlement of the balance of the indebtedness, thus implying that its acceptance would entirely discharge the obligation; and the court held that by accepting the check the creditor was estopped to recover more.

"*In the controversy now before us, it does not appear that the payments were tendered upon a condition, expressed or implied, that the indebtedness would be fully satisfied if they were accepted.* * * *

"Under the circumstances shown above, plaintiff, we think, is not estopped by its described actions. * * *" (Emphasis supplied.)

See also, to the same effect, Emerson v. Shirley, 191 La. 741, 186 So. 88; Breaux v. Savoie, 39 La.Ann. 243, 1 So. 614.

plaintiff was claiming were due, and there was no showing that defendant had been misled:

"* * * It was the duty of appellant and its predecessors under the leases in question, to pay appellee each month for the gas it had bought from him in the previous month. The performance of this duty and the receipt by appellee of the check, could not of itself raise an estoppel against appellee, constitute a settlement, or be the basis of any claim of accord and satisfaction. Nor would the fact that appellant was dissatisfied with the price and grumbled about it, at all change

15. 24 American Jurisprudence 34, et seq., verbo "Fraud and Deceit", §§ 209, 210:

"* * * *To invoke the rule of waiver, however, it has been held to be essential to show that the defrauded party intentionally condoned the fraud, affirmed the contract, and abandoned all right to recover damages for the fraud, with full knowledge thereof. The affirmance must be equivalent to ratification.* The question of outright waiver is one of intent; and it is essential to such waiver that the victim possess full knowledge of the fraud practiced upon him and that he *intend to affirm the contract and abandon his right to recover damages for the loss resulting from the fraud.*

\* \* \* \* \*

"Equivocal acts which do not clearly evince a purpose, with complete knowledge of the fraud, to retain the property as his own will not defeat the right of a person defrauded to rescind. The act must be unequivocal and must show an election to retain the property after discovering the deceit before the right to rescind is gone. *Where subsequent acts are relied upon as a defense in a case where fraud is clearly established, it is said the acts must stand upon the clearest evidence, must evince a purpose to waive or forgive the fraud, and must amount to a clear election not to rescind. If what is done is merely for the purpose of saving the plaintiff from further loss, without any purpose to give up whatever right he may have either at law or in equity to rescind, the right of rescission will not be affected.* * * *" (Emphasis supplied.)

See also, to the same effect, Commercial National Bank v. Parsons, 5 Cir., 144 F.2d 231.

the situation. *In order for there to have been an estoppel, appellee must have acted in such a way as to mislead appellant to its detriment, whereas all that appellee did here was to receive the moneys appellant felt bound to tender. In order for there to have been an accord and satisfaction or a settlement for less than was appellee's due, there must have been a real dispute and that dispute must have gone to the point of a recognized active controversy and a settlement of that controversy on terms understood and accepted by the parties to it as such a settlement.* * * * * *"* (Emphasis supplied.)

▆ Defendant further claims that, since Mrs. Johnson and Mrs. Jennette attended the stockholders' meeting held on September 15, 1953, and voted to ratify the purchases of minority stock previously made by defendant's officers, and for a resolution authorizing the Board of Directors to purchase their stock, they thereby ratified all that was done, and are estopped to maintain their present position. It is our conclusion, however, based upon the authorities cited above, that they did not thereby ratify defendant's previous fraud, or that about to be committed upon them, of which they were ignorant, nor are they estopped now to assert it.

We conclude, therefore, that since defendant was not misled by anything done or omitted by Mrs. Johnson and Mrs. Jennette, nor was it injured in any way, and since it is entirely clear that these ladies neither actually nor impliedly intended to ratify or condone the fraud that was committed upon them, this defense is without merit and must be rejected.

▆ Max Brown is in a somewhat different position than the other plaintiffs, in that he knew defendant's stock was worth at least $2,000 per share, on a liquidation basis, when he sold his stock to the company.

The circumstances were that he was employed as manager of defendant's Zwolle mill at an annual salary of $15,-

000. He owned 65 shares of stock. During the summer of 1953, he was instructed by defendant's president to come to the General Office at Shreveport, where he saw his cousin, Brown McCullough. No effort was made to negotiate with him to sell or to fix a price for his stock. He simply was told that the president of the company wanted him to "turn in" his stock for $350 per share. At that time he told McCullough it was worth more than $2,000 per share on a liquidation basis, but was assured that there were no plans for liquidation, present or future. Because he did not want to risk losing his job, and having been promised that there would be no liquidation, he readily agreed to, and did, sell his stock for $350 per share.

Shortly thereafter, McCullough transferred one share of stock to Max Brown on the company's books, but simultaneously had him endorse it back to the company. The purpose of this was to qualify Brown to serve as a director, which he did until the company's assets were sold. He attended the annual shareholders' and directors' meetings held in September of 1953, 1954 and 1955. Among other actions in that capacity, he voted at the stockholders' meeting in September, 1953, to ratify the purchase by the officers of the minority stock, including his own; and at the special shareholders' meeting held on September 26, 1955, he also voted in favor of the plan of liquidation then submitted, although he previously had requested to "come back into the company", on July 9, 1955. When the company's assets were sold in 1956, he was given one year's salary as severance pay, similar amounts having been paid to other long-time employees at that time.

Defendant argues that there was no fraud committed against Max Brown, and that, in any event, he has ratified what was done, so as to estop him from recovery in this suit.

It is our opinion that fraud was committed upon Max Brown in that he would not have sold his stock had it not been for the false promise, made to him by his

cousin, that defendant would not be liquidated. It also is our view that he was forced to act under heavy duress, not only in selling his stock but at all times until his job was terminated in 1956. Before he sold, he held relatively few shares of stock with a rather poor dividend record. His salary with defendant, as a going concern, thereby was made to appear to be of far greater importance than the price of the stock. He wanted to continue earning that salary. There was a strong likelihood that he would be fired if he opposed the wishes of defendant's president, who had absolute power to terminate his job at any time.

Brown was the victim, therefore, of both fraud and business duress. He knew the liquidation value of his stock, but did not know that serious plans to liquidate defendant already were afoot, contrary to what his cousin had assured him. He did not want to be fired, so he sold, with full reliance upon McCullough's promises. He likewise was under duress at the stockholders' meetings in 1953 and 1955. At the first meeting, he did not know that fraud had been and would be committed. At the second, when he voted the one share standing in his name in favor of liquidation, he knew he actually did not own that share, and, in any event, he hoped to continue working for a good salary as long as possible, with some hope of severance pay. Consequently, rather than raise an ineffective ruckus, and knowing that the majority had more votes than it needed to decree liquidation, he "went along" by voting for liquidation.

Nothing Max Brown did in this respect misled defendant to its detriment in any way, and, by the same token, what he did was not a free and voluntary ratification, especially since the full tenor of defendant's fraud was not then ascertainable or apparent, being more a matter of strong suspicion than provable fact.

While Max Brown's case is not as strong as that of the other plaintiffs, on the basis of the authorities cited above, and also upon Dale v. Simon, Tex.Com. App., 267 S.W. 467, 79 A.L.R. 659; New Orleans & Northeastern Ry. Company v. Louisiana Construction and Improvement Company, 109 La. 13, 22, 33 So. 51; Sistrom v. Anderson, 51 Cal.App.2d 213, 124 P.2d 372, 376; Starks v. Field, 198 Wash. 593, 89 P.2d 513, 515; Voellmeck v. Harding, 166 Wash. 93, 6 P.2d 373, 84 A.L.R. 608; 17A American Jurisprudence 564, et seq., verbo "Duress and Undue Influence", §§ 7, 26; Commercial National Bank in Shreveport v. Parsons, supra, we must find that the defense of ratification by Max Brown is unmeritorious and must be rejected.

Defendant has made a large number of additional points of defense, mostly collateral or incidental to those we have discussed. It also has cited many cases and textual authorities, not mentioned herein. We have carefully considered all of these, but have found that the defenses are without merit and the authorities relied on are distinguishable because of the facts here found. It would unduly lengthen this necessarily extensive opinion expressly to discuss them here.

In conclusion, we must note for the record our sincere regret at having been forced to find that defendant's officers were guilty of fraud. We have done this reluctantly, and only because the proof is so clear. To have overlooked it, or to have characterized their actions in any other light, not only would be less than candid, but would be a violation of our sworn duty.

For the reasons given, therefore, a decree will be entered herein, ordering rescission of the sales of plaintiffs' stock to defendant, as made in 1953, and recognizing plaintiffs as its equitable owners. Defendant will be required to make a full, accurate accounting upon terms to be settled.

A proper decree should be presented for signature.